**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

ANTHONY DEWAYNE MALONE, SR.,                                                    PLAINTIFF

v.                                              3:22CV00204-JTK

DOES, et al.                                                                    DEFENDANTS

**ORDER**

Defendants Case, Franks, Barnum, Sanchez, and Floyd (collectively, the "County Defendants") filed a Motion for Summary Judgment on the merits of Plaintiff's claims, together with a Brief in Support and Statement of Undisputed Facts. (Doc. Nos. 89-91). Defendant Crocker[1] also filed a Motion for Summary Judgment on the merits of Plaintiff's claims, together with a Brief in Support and Statement of Undisputed Facts. (Doc. Nos. 93-95). Plaintiff has responded to both Motions. (Doc. Nos. 98, 106). The County Defendants have replied. (Doc. No. 103).

After careful consideration and for the reasons set out below, the County Defendants' Motion for Summary Judgment (Doc. No. 89) is GRANTED in part and DENIED in part. Defendant Crocker's Motion for Summary Judgment (Doc. No. 93) is GRANTED in part and DENIED in part.[2]

I.      **Introduction**

Anthony Dewayne Malone, Sr. ("Plaintiff") was in custody at the Greene County, Arkansas, Detention Center at the time he filed this lawsuit. (Doc. No. 1). He later was

---

[1] Defendant Bailey Crocker was formerly Bailey Burns. (Doc. No. 94).

[2] The parties consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings and order the entry of a final judgment. (Doc. No. 67).

transferred to the Tallahatchie County Correctional Facility in Tutwiler, Mississippi, where he currently is incarcerated.   (Doc. No. 74).

In August 2022, Plaintiff sued Greene County Jail Administrator Robert Case, Sheriff Steve Franks, Officer Jamie Floyd, Lieutenant Dane Barnum, Head of Medical Staff Bailey Crocker, and Kitchen coordinator Jasmine Sanchez in their personal and official capacities.   (Doc. Nos. 1, 3, 7).   Plaintiff alleged: Defendants Case, Franks, Barnum, and Sanchez interfered with his ability to access his religion by denying him a Kosher diet; Defendants Crocker and Floyd were deliberately indifferent to his serious medical needs arising from the denial of a Kosher diet; and retaliation by unidentified Detention Center Staff.    (Doc. Nos. 1, 3, 6-1, 7-1).   Plaintiff's retaliation claim was not served.   Plaintiff's First Amendment claim and claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") were served on Defendants Case, Franks, Barnum, and Sanchez; Plaintiff's deliberate indifference to serious medical needs claims were served on Defendants Crocker and Floyd.   (Doc. No. 6-1).

## II.    Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997).   "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"   Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)).   "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth

specific facts showing that there is a genuine issue for trial.'" <u>Id</u>. at 1135.   Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit."   <u>Id</u>.

In addition, "[a]ll material facts set forth in the statement (of undisputed material facts) filed by the moving party...shall be deemed admitted unless controverted by the statement filed by the non-moving party . . . ."   Local Rule 56.1, Rules of the United States District Court for the Eastern and Western Districts of Arkansas.   Failure to properly support or address the moving party's assertion of fact can result in the fact considered as undisputed for purposes of the motion. FED. R. CIV. P. 56(e).

## III.   Analysis

Plaintiff sued all Defendants in their personal and official capacities.   Plaintiff alleged Defendants Case, Franks, Barnum, and Sanchez violated his rights protected by the First Amendment and RLUIPA.   Plaintiff also alleged Defendants Crocker and Floyd were deliberately indifferent to his serious medical needs.   Plaintiff seeks damages and injunctive relief.   (Doc. No. 7-1 at 25-26).

As an initial matter, the Court notes that Plaintiff's Responses (Doc. Nos. 98, 106) do not comply with the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas.   Local Rule 56.1 requires any party moving for summary judgment to include "a separate, short and concise statement of the material facts as to which [he] contends there is no genuine dispute to be tried."   LOCAL RULE 56.1(a).   The Local Rules are binding on the parties.   <u>Silberstein v. IRS</u>, 16 F.3d 858, 860 (8th Cir. 1994) (citing <u>Braxton v. Bi-State Dev.</u>

Agency, 728 F.2d 1105 (8th Cir. 1984)).   Very early on in this case Plaintiff was advised that he must comply with the Local Rules and Federal Rules of Civil Procedure.   (Doc. No. 2 at 1).

Plaintiff did not file a separate statement of undisputed facts.   This failure is not only contrary to required procedure, it prevents the Court from determining which facts Plaintiff maintains are undisputed.

Further, Plaintiff's Response to a large extent simply asserts that Defendants' accounts are untruthful.   (Doc. No. 98).   As set out in Federal Rule of Civil Procedure 56(c)(1):

> A party asserting that a fact . . . is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).

Plaintiff did not support any assertion he made in the manner required by the federal rules. (Doc. No. 98).   See also Crossley v. Georgia-Pacific, Corp., 355 F.3d 1112, 1113-14 (8th Cir. 2004) (affirming the grant of summary judgment because a plaintiff failed to properly refer to specific pages of the record that supported his position).

When a party fails to properly address another party's assertion of fact as required by Rule 56(c), the court may "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed— show that the movant is entitled to it."   FED. R. CIV. P. 56(e)(2),(3).   Accordingly, the Court deems admitted the facts set out in the County Defendants' Statement of Undisputed Facts (Doc.

No. 91) and deems admitted the facts set out Defendant Crocker's Statement of Undisputed Facts (Doc. No. 94).

### A.      County Defendants' Motion

Unless otherwise noted, the following facts are undisputed.   (Doc. Nos. 91, 98, 106). Plaintiff was booked in at the Greene County Detention Center on June 28, 2022.   Greene County contracts with TurnKey to provide medical care to inmates at the Detention Center.   At the time Plaintiff was booked in at Greene County, he had uncontrolled diabetes mellitus and hypertension. Plaintiff's blood pressure was taken at least once a day between June 29, 2022 and July 5, 2022. For the remainder of Plaintiff's incarceration at the Detention Center, Plaintiff's blood pressure was taken weekly.   Plaintiff's fasting blood glucose was measured one-to-two times daily.

Plaintiff initially was placed on a diabetic and cardiac diet, but he disliked the diet and refused to continue it.   Some time later, at Plaintiff's request, he was put back on the medical diet.

The Greene County Detention Center has a policy and procedure for Kosher Meals that includes review by the Facility Chaplain.   It can take approximately 30 days from the time Kosher Meals were requested to the time an inmate is added to the Kosher meal service.

Plaintiff first requested a Kosher meal on July 11, 2022.   Plaintiff's original request reads:

I'm trying to change my meals to Kosher meals. Chicken fish turkey meats only. Scramble eggs no boil eggs building up gas overnight and cereal for breakfast No cake can't eat with medicine need food with my medicine Turkey bacon/sausage chicken bacon/sausage. I have and take high cholesterol medicine so no greasy foods.

Defendant Barnum rejected the request on July 12, 2022, explaining that the Kosher Meal request did not work that way.   Plaintiff continued to request Kosher Meals in a similar manner, without result.   On July 26, 2022, Defendant Sanchez told Plaintiff that a proper request form would be provided to him.

On July 28, 2022, Plaintiff claimed for the first time that he was being discriminated against for his beliefs, but Plaintiff did not claim or state any actual belief. The Detention Center Religious Diet policy allows for the provision of Kosher meals. (Doc. No. 89-5 at 7). Once receiving Kosher meals, an inmate agrees to adhere to the requested diet, not trade or barter food items with other inmates, and not to violate the Kosher diet with commissary items that go against the inmate's beliefs. (Id. at 8). Plaintiff began receiving Kosher meals by August 2, 2022. (See also Doc. No. 93-3 at 299). Shortly after Plaintiff began receiving Kosher meals, he was taken off Kosher meal service because he was purchasing non-kosher items in the commissary and eating them. (Doc. No. 98 at ¶¶ 7, 8). Additionally, Plaintiff was trading Kosher food items from his meal trays for non-Kosher items from other inmates.

After Plaintiff was taken off Kosher meal service, he verbally requested to be put back on the medical diet. Plaintiff was placed back on the medical diet, but the asked medical to place him back on Kosher meal service. Medical staff does not place inmates on Kosher diets, and requests for Kosher meal service are not made to medical. Plaintiff also complained that his Kosher meal trays were "noncompliant."

Throughout Plaintiff's time at the Detention Center, Plaintiff was seen by APRN Anthony Carter, who worked under the supervision of a TurnKey medical doctor. Plaintiff had labs done to monitor his medical conditions. Plaintiff's labs indicated that he is not a "patient who is an imminent risk of harm nor is he suffering from an emergent condition," but showed that Plaintiff has uncontrolled diabetes mellitus. Plaintiff often did not comply with treatment, which exacerbated his conditions and placed him at risk for kidney disease. Plaintiff weighed 270 pounds and was clinically obese.

Nurse Carter first saw Plaintiff on July 5, 2022. Plaintiff self-reported that he was diagnosed with hypertension several years before, his prescribed medicine was adequately treating his condition, his blood pressure was well-controlled, and he had no other issues or complaints. Because Nurse Carter concluded that Plaintiff's diabetes and hypertension were stable, and there were no signs that Plaintiff had an emergent or acute medical condition requiring further treatment, Nurse Carter continued Plaintiff's medical management and ordered labs and a follow up in 30 days. Plaintiff had labs drawn again in November 2022; those lab results did not indicate any emergent or new medical condition.

Plaintiff was often noncompliant with his medical care, exacerbating his medical conditions even with the prescribed treatment. Plaintiff says this is a half-truth, but provided no explanation or evidence of what he means by that. (Doc. No. 98 at ¶ 2). According to Nurse Carter, he explained to Plaintiff many times that his noncompliance with treatment was exacerbating his medical conditions and placing him at risk for kidney disease.

During his time at the Detention Center, Plaintiff received several prescription medications that were paid for by the United States Marshals Service ("USMS"). Plaintiff's medications were always kept in stock at the USMS and Allcare Pharmacy. Plaintiff, however, did not trust the pharmacy and refused to take those medications. Instead, Plaintiff insisted on taking medication delivered from home by his fiancé. Plaintiff's fiancé did not always deliver Plaintiff's medication, so his medication was not always available. Plaintiff disputes that fact. (Doc. No. 98 at ¶ 4).

On or around July 30, 2022, Plaintiff went on a "hunger strike" because he believed his Kosher meal trays were noncompliant. (See also Doc. No. 93-3 at 301, 311). During this time, Plaintiff was still eating commissary foods. As such, TurnKey providers did not consider

Plaintiff's actions a true hunger strike.   When Defendant Crocker attempted to take Plaintiff's vital signs on August 2, 2022, Plaintiff refused.   Medical staff continued to monitor Plaintiff's vital signs when allowed and Plaintiff's overall health conditions during his hunger strike.

Plaintiff made medical complaints during this time, and was taken to the hospital.   The hospital visit was brought on by Plaintiff refusing jail meal trays and eating almost exclusively junk food from the commissary.   The County Defendants maintain that hospital providers warned Plaintiff that he has the potential to develop mild kidney disease, which is consistent with uncontrolled diabetes and hypertension.   The Court notes, however, that the hospital medical records provided:

> The blood work today showed mild kidney disease.   This can be caused from uncontrolled blood pressure, blood sugar or medications.   You're your doctor follow up on this.   Patient is medically screened and fit for incarceration.   Continue all home medications.   The CT and blood work did not show any emergent findings.   Diabetes in the main cause of renal insufficiency.

(Doc. No. 93-3 at 249, 285-286).

Upon Plaintiff's return to the Detention Center, Nurse Carter assessed Plaintiff.   Nurse Carter explained to Plaintiff that he has uncontrolled diabetes mellitus, which places him at increased risk for kidney disease, and that Plaintiff's noncompliance was causing the uncontrolled diabetes.   Specifically, Plaintiff had been noncompliant with his medications, including insulin, used to treat his diabetes mellitus and kidney issues.   (See also Id. at 212).

After Plaintiff complained that he lost weight, Nurse Carter assess Plaintiff again at the end of August 2022.   Plaintiff had lost 30 pounds, but the weight loss did not indicate any emergent or new medical condition that required additional treatment.   Plaintiff's vital signs were stable. Nurse Carter reviewed Plaintiff's lab results and again discussed with him the importance of complying with his medication.

On September 10, 2022, Plaintiff submitted another sick call and requested new labs and an update on his kidney disease treatment.   Defendant Crocker advised Plaintiff that based on his recently drawn labs, no additional treatment was necessary.

Two days later, on September 12, 2022, Detention Center staff found medication that Plaintiff hoarded in his cell.   Defendant Crocker identified the medication as Metformin to treat Plaintiff's diabetes, two glucose tablets and two inhalers.   Plaintiff refused an off-site dental appointment on this date because he was mad that his cell was searched.

Nurse Carter saw Plaintiff again in November 2022 and discussed recent lab results, which continued to show Plaintiff's noncompliance.

TurnKey monitored Plaintiff's blood pressure weekly between September 1, 2022 and January 5, 2023.   Plaintiff's blood pressure was essentially normal except for an elevated systolic level on October 27, 2022, and an elevated diastolic level on November 17, 2022.   Plaintiff received prescription medicines throughout his incarceration.

Plaintiff's Detention Center medical records were submitted as evidence by Defendant Crocker.   (Doc. No. 93-3 & Doc. No. 93-4).   Plaintiff has not contested the authenticity or accuracy of these records.

Plaintiff ultimately was transferred from the Detention Center on January 12, 2023.

### 1.    Qualified Immunity

The County Defendants ask the Court to dismiss Plaintiff's claims against them in their individual capacities based on qualified immunity.   (Doc. No. 90 at 26-28).   Qualified immunity shields a government official from liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   Qualified immunity is a question of law, not a question of

fact.   <u>McClendon v. Story County Sheriff's Office</u>, 403 F.3d 510, 515 (8th Cir. 2005).   Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. <u>See</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

        To determine whether defendants are entitled to qualified immunity, courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful.   <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009).[3]   "'A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"   <u>Thurmond v. Andrews</u>, 972 F.3d 1007, 1012 (8th Cir. 2020) (internal citation omitted).   In considering whether a right is clearly established, courts do not look at precedent "at a high level of generality."   <u>Id</u>.   Instead, courts "look for a controlling case or a robust consensus of cases of persuasive authority. There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Id</u>. (internal citation omitted).   A defendant is entitled to qualified immunity only if no reasonable fact finder could answer both questions—whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right and whether that right was so clearly established that a reasonable official would have known that his

---

        [3] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Nelson</u>, 583 F.3d at 528 (quoting <u>Pearson v. Callahan</u>, 555 U.S. at 236).

or her actions were unlawful—in the affirmative.   <u>Nelson v. Correctional Medical Services</u>, 583 F.3d 522, 528 (8th Cir. 2009).

### 2.    Injunctive Relief

Plaintiff was transferred from the Greene County Detention Center to the Tallahatchie County Correction Facility in January 2023.   (Doc. No. 74).   All Defendants are located in Greene County, Arkansas.   Nothing in the record indicates that any named Defendant now has any control over Plaintiff's meals or medical care.   As such, nothing indicates that any Defendant continues to subject Plaintiff to the alleged violations of Plaintiff's rights—or that there is even a possibility that will happen.   Plaintiff's requests for injunctive relief under § 1983, then, are moot. <u>Buchanan v. Maye</u>, No. 2:21-CV-13-DPM-ERE, 2021 WL 4901747, at *1 (E.D. Ark. Sept. 22, 2021), <u>report and recommendation adopted,</u> No. 2:21-CV-13-DPM-ERE, 2021 WL 4895862 (E.D. Ark. Oct. 20, 2021) (citing <u>Gladson v. Iowa Dept. Corrs</u>., 551 F.3d 825, 835 (8th Cir. 2009) (holding that a prisoner's request for injunctive relief in a § 1983 action was rendered moot by his transfer to another correctional facility); <u>Owens v. Issac</u>, 487 F.3d 561, 564 (8th Cir. 2007) (a prisoner's request for prospective injunctive relief was rendered moot when he was transferred to different prison and was no longer subject to the alleged constitutional violations); <u>Martin v. Sargent</u>, 780 F.2d 1334, 1337 (1985) (a prisoner's request for injunctive relief to improve the general conditions at the Cummins Unit was moot because he was at the Wrightsville Unit)).

Likewise, Plaintiff's official capacity RLUIPA claims are moot—because injunctive relief is the only available remedy for an official capacity claim under RLUIPA.   <u>Van Wyhe v. Reisch</u>, 581 F.3d 639, 65255 (8th Cir. 2009).

Because Plaintiff's claims for injunctive relief are moot, those claims are dismissed without prejudice.  Ali v. Cangemi, 419 F.3d 722, 723-24 (8th Cir. 2005).

### 3.      RLUIPA and First Amendment

Plaintiff alleged that he initially was denied Kosher meals outright.  Once Plaintiff was added to Kosher meal service, he alleged that the Kosher meals he received were uncovered, unsealed, and "NOT a Jewish Kosher meal."  (Doc. No. 7-1 at 1-12).

As mentioned above, Plaintiff seeks damages and injunctive relief.  Because Plaintiff's claims for injunctive relief are moot, only Plaintiff's damages claims remain.

### a.      Personal Capacity RLUIPA Claims

Plaintiff sued all Defendants in their official and personal capacities. The United States Court of Appeals for the Eighth Circuit has held that because Title IX was enacted under the Spending Clause, "Title IX will not support an action against [a school official] in her individual capacity." Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 610-11 (8th Cir.1999).  This is the same rationale for rejecting individual liability under RLUIPA adopted by the United States Court of Appeals for the Fourth Circuit in Rendelman v. Rouse, 569 F.3d 182 (4th Cir. 2009) and the Seventh Circuit in Nelson v. Miller, 570 F.3d 868, 885-89 (7th Cir. 2009).  The Court of Appeals for the Eighth Circuit affirmed summary judgment where the district court dismissed a plaintiff's RLUIPA damages claims against ADC officials.  Heikkila v. Kelley, 776 Fed. Appx. 927, 928 (8th 2019) (per curiam) (citing Haight v. Thompson, 763 F.3d 554, 570 (6th Cir. 2014) ("Every circuit to consider the question, whether before Sossamon or after, has held that RLUIPA does not permit money damages against state prison officials, even with the lawsuit targets the defendants in their individual capacities.")).  Considering the above-cited cases, Plaintiff is not entitled to damages against Defendants in their individual capacities under RLUIPA.

### b.      Personal Capacity Claims: First Amendment

Inmates retain their First Amendment right to free exercise of religion.   Cruz v. Beto, 405

U.S. 319, 322 (1972).   Limitations, however, may be placed on the exercise of those rights based

on the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny

analysis are evaluated under a lesser standard in the context of a prison setting.   Turner v. Safley,

482 U.S. 78, 81 (1987).   Under Turner, a prison regulation may restrict a prisoner's constitutional

rights if it is "reasonably related to legitimate penological interests."   Turner, 482 U.S. at 89.

Turner sets out four factors courts should consider when evaluating freedom of exercise

claims: (1) whether there is a valid rational connection between the prison regulation and the

government interest justifying it; (2) whether alternative means are available to the inmate to

exercise the right; (3) whether an accommodation would have a significant ripple effect on guards,

other inmates, and prison resources; and (4) whether there is an alternative that fully

accommodates the prisoner at de minimis cost to valid penological interests.   Id. at 89-91.

In analyzing a free exercise claim, a court must "consider first the threshold issue of

whether the challenged governmental action infringes upon a sincerely held religious belief and

then apply the Turner factors to determine if the regulation restricting the religious practice is

reasonably related to legitimate penological objectives."   Gladson v. Iowa Dep't. of Corrections,

551 F.3d 825, 831-32 (8th Cir. 2009) (internal citation omitted).

The County Defendants argue that Plaintiff lacked a sincere religious belief establishing

the need for Plaintiff to receive Kosher meals.   (Doc. No. 90 at 13-14).   As evidence, the County

Defendants point to Plaintiff's commissary records, pointing out numerous non-Kosher purchases.

(Doc. No. 90 at 14-19; Doc. No. 89-3).   Even if those items were inconsistent with a Kosher diet,

"a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous

in his observance." <u>Grayson v. Schuler</u>, 666 F.3d 450, 454 (7th Cir. 2012).   Importantly, the sincerity of a religious belief is a question of fact best left to a jury.   <u>Murphy v. Missouri Dep't. of Corrections</u>, 372 F.3d 979, 983 (8th Cir. 2004) (internal citation omitted).   A court "must not quickly dismiss such claims on summary judgment by concluding those beliefs are not genuine." <u>Id</u>.   As such, the Court will assume, without finding, that Plaintiff had a sincere religious belief establishing the need for him to receive Kosher meals.

The County Defendants also argue that there was no substantial burden on Plaintiff's ability to practice his religion.   (Doc. No. 90 at 20-21).   The Court agrees.   Plaintiff initially was denied Kosher meals because his first request was health related and the for procedural reasons, but within approximately two weeks he began receiving Kosher meals.   After Plaintiff began receiving Kosher meal service, Plaintiff refused the meal because the meals were "noncompliant."   Plaintiff purchased items from the commissary to supplement his diet.   In Plaintiff's Response to the County Defendants' Motion, Plaintiff "asserts that the disputed items are acceptable substitutes." (Doc. No. 98 at ¶ 8) (See also Doc. No. 89-3 listing commissary items purchased).

In <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807, 813 (8th Cir. 2008), the plaintiff's "*halal* diet [did] not allow him to consume any meat unless the animal [had] been slaughtered during a prayer to Allah."   <u>Patel</u>, 515 F.3d at 810.   The plaintiff challenged all meal options available to him based on the lack of *halal* meat, as well as alleged cross-contamination between *halal* and *haram* (not *halal*) foods.   The Court of Appeals for the Eighth Circuit found no substantial burden because the plaintiff had the option of purchasing *halal* vegetarian entrees and commissary items— and did not provide financial information to support his claim that doing so would be cost prohibitive—and because the plaintiff did not exhaust alternative means of accommodating his religious dietary needs.

Here, as in <u>Patel</u>, Plaintiff—by his own admission—had Kosher food items or acceptable substitutes available for purchase at the commissary, and Plaintiff purchased those items. Plaintiff has not presented evidence that the expense of buying commissary items was cost prohibitive.   Further, nothing in the record indicates that Plaintiff explored or exhausted alternative ways of accommodating his religious dietary needs.  The Court notes that Plaintiff maintains his family always brought him the medication he required.   (Doc. No. 98 at ¶¶ 4, 14). But, for example, nothing in the record indicates that Plaintiff ever explored receiving meals from outside sources.   Under these circumstances, like in <u>Patel</u>, Plaintiff has not established a substantial burden.   Even if there was a violation, the Court is not aware of clearly established law pursuant to which any County Defendant should have known that his or her behavior violated Plaintiff's rights.   The County Defendants are thus entitled to qualified immunity as to this claim.

### c.        Official Capacity Claims: First Amendment

Because the Court found no Defendant liable in his or her individual capacity, Plaintiff's official capacity First Amendment claims also fail.

### d.        Official Capacity Claims: RLUIPA

As explained above, Plaintiff's official capacity RLUIPA claims fail: the only available remedy is injunctive relief and Plaintiff already has been transferred, rendering moot any requests for injunctive relief.

### 4.        Deliberate Indifference to Serious Medical Needs

Plaintiff indicated that at the time of the events giving rise to this lawsuit, he was in jail and still awaiting trial on pending criminal charges.   (Doc. No. 7-1 at 4).   In other words, Plaintiff was a pretrial detainee.   Prison officials violate a pretrial detainee's rights under the Due Process Clause of the Fourteenth Amendment when they show deliberate indifference to his serious

medical needs.   Ivey v. Audrain County, Missouri, 968 F.3d 845, 848 (8th Cir. 2020).   To succeed on a claim of deliberate indifference to a medical need, a plaintiff must show that he had an objectively serious medical need and that prison officials had actual knowledge of, but deliberately disregarded, that need.   East v. Minnehaha Cnty., 986 F.3d 816, 820 (8th Cir. 2021). Merely stating that a Defendant had "actual knowledge" of a serious medical need, without pleading additional facts to support the conclusory statement, is insufficient to state a deliberate indifference to serious medical needs claim.   Id.   "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to [a] prisoner's serious medical needs."   Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).   But "[m]ere negligence is not sufficient to support a cause of action under § 1983."   Davis v. Hall, 992 F.2d 151, 153 (8th Cir. 1993).

In his Complaint, Plaintiff asserted that his medical conditions arose as a result of the denial of Kosher meals.   (Doc. No. 7-1).   For example, Plaintiff explained that he is a diabetic "on medications, including insulin and high-blood pressure medication, and needs nourishing meals with these meds."   (Id. at 13).   At one point, Plaintiff declined meal trays and instead bought and ate food from the commissary.   (Id. at 7-1 at 9-20, for example).   As Plaintiff explained in an earlier Motion for Preliminary Injunction and Temporary Restraining Order, "eat[ing] un[nutritious] snacks prepackaged from commissary . . . doesn't give him a balanced diet nor does it balance his diabetes sugar levels."   (Doc. No. 20 at 2).   Plaintiff acknowledged in his Complaint that when he went to the hospital, he was told he had "mild kidney disease due to out of control blood sugar from diabetes."   (Doc. No. 7-1 at 20).

The Court notes that Plaintiff's deliberate indifference to serious medical needs claim as to the County Defendants was brought against and served only against Defendant Floyd.   (Doc. No. 6-1 at 2).

Despite the County Defendants' argument to the contrary (Doc. No. 90 at 31), Plaintiff had serious medical needs – diabetes and hypertension that were diagnosed by a physician.   The County Defendants next argue that Plaintiff cannot establish deliberate indifference.   The Court agrees.

The County Defendants do not directly address Plaintiff's argument that the denial of Kosher meals resulted in Plaintiff's problems with his diabetes.   Nonetheless, nothing in the record supports Plaintiff's assertion that the denial of a Kosher meal was the cause of his medical conditions.   Nothing in the record establishes that a Kosher meal would have remedied Plaintiff's out-of-control diabetes or his hypertension.   For example, Plaintiff maintains that the commissary items he bought were acceptable Kosher substitutes.   (Doc. No. 98 at ¶ 8).   But many of those items, even the ones marked Kosher, were not healthy choices for a diabetic suffering from hypertension: tootsie pop drops; Reese's peanut butter cups; butterscotch disks, jolly ranchers; Frito Lay Doritos; Frito Lay BBQ; and Malt-O-Meal Frosted Flakes, among others.   (Doc. No. 47-2).   See also Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")   Thus, a Kosher diet does not necessarily equate to a healthy diet for a diabetic suffering from hypertension.

Plaintiff did not contest the Statement of Undisputed Facts submitted by the County Defendants, or the medical records submitted by Defendant Crocker.   (Doc. Nos. 91, 93-3, 93-4; Doc. Nos. 98, 106).   The record reflects that Plaintiff's blood sugar and blood pressure was monitored while he was at the Detention Center.   (Doc. No. 93-3 at 7-21).   The record also

reflects that Plaintiff often refused medication.   (Doc. No. 93-3 at 60-74, for example and among others; Doc. No. 93-4 at 13-16, for example and among others).   Plaintiff explained that he refused insulin because his blood sugar was not high enough to warrant taking it at each prescribed time. (Doc. No. 53 at 10-11, for example and among others).   Plaintiff provided no evidence, though, to establish the insulin prescribed amounted to deliberate indifference to his serious medical needs. Moreover, at times during this case Plaintiff has maintained that his diabetes was not out of control. (Id.).   And yet Plaintiff acknowledged in his Complaint that when he went to the hospital, he was told he had "mild kidney disease due to out of control blood sugar from diabetes."   (Doc. No. 7-1 at 20).

Plaintiff's refusal of medication is significant.   See, for example, Beck v. Skon, 253 F.3d 330, 333-34 (8th Cir. 2001) (summary judgment where a prisoner failed to comply with recommended treatment, among other things); Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997) (no deliberate indifference where doctors' efforts "were impeded by [the prisoner's] apparent inability or refusal to follow their instructions").

The record includes when medication was administered and what medication Plaintiff was given.   (Doc. No. 93-4).   While Plaintiff may have preferred different medication or other treatment options, he has no right to his preferred course of treatment—so long as there otherwise is no violation of his rights.   Barr v. Pearson, 909 F.3d 919, 921-22 (8th Cir. 2018).

All things considered and based on the undisputed facts considered in the light most favorable to Plaintiff, no reasonable jury could find that Defendant Floyd—or any other County Defendant—was deliberately indifferent to Plaintiff's serious medical needs.   Even if there was a violation, the Court is not aware of clearly established law pursuant to which any County

Defendant should have known that his or her behavior violated Plaintiff's rights.   As such, the County Defendants are entitled to qualified immunity.

The Court notes that in his Response, Plaintiff did make certain assertions, including: no Defendant is a registered dietician; Plaintiff tried to refer Detention Center staff to an information portal where they could see a complete list of Kosher meals acceptable to his faith; no African Americans work at the Detention Center; the only person of color working at the Detention Center is Defendant Sanchez; Defendant Crocker lied that Plaintiff threatened her; and no Defendant knew what a Kosher meal was, among others.   (Doc. No. 98).   None of these assertions, however, are material to the pending Motion.   And, as already mentioned above, none of the assertions were properly supported.

### B.   Defendant Crocker's Motion

The law applicable to Plaintiff's deliberate indifference to serious medical needs claim against Defendant Crocker is the same as that set out above in connection with the County Defendants' Motion.

At the times relevant to Plaintiff's claims, Defendant Crocker was a Licensed Practical Nurse employed by TurnKey Health Clinics, LLC to provide nursing services at the Greene County Detention Center.   (Doc. No. 93-6 at 1).   Only Plaintiff's deliberate indifference to serious medical needs claims were served on Defendant Crocker.   Nonetheless, it is undisputed that no medical personnel, including Defendant Crocker, had any involvement with religious diets. (Doc. No. 93-6 at ¶ 8; Doc. No. 98; Doc. No. 106).

The following facts are uncontested.   (Doc. Nos. 94, 98, 106).   Plaintiff was arrested and booked into the Detention Center on or around June 27, 2022.   During intake and medical screening, Plaintiff reported having high blood pressure and diabetes.   Because both Plaintiff's

high blood pressure and diabetes were uncontrolled, medical staff closely monitored Plaintiff's blood pressure and fasting glucose.   Staff monitored Plaintiff's blood pressure daily between June 29, 2022 and July 5, 2022.   Between September 1, 2022 and January 5, 2023, Plaintiff's blood pressure was monitored weekly.   Staff monitored Plaintiff's fasting blood glucose at least 1-2 times daily between June 29, 2022 and January 12, 2023.   Plaintiff received medical care and treatment throughout his incarceration in the Detention Center.

During Plaintiff's July 5, 2022 chronic care appointment with Nurse Carter, Plaintiff reported that he was diagnosed with hypertension six years earlier and that his blood pressure was well controlled.   Plaintiff's vital signs were stable and did not indicate an acute or serious underlying condition warranting medical treatment in addition to that which he already was receiving.   Plaintiff weighed 270 pounds, which classified him as obese.   Nurse Carter assessed Plaintiff's hypertension as stable, ordered labs, and planned further labs in 30 days.

Defendant Crocker scheduled Plaintiff to see the nurse practitioner in connection with Plaintiff's complaint of dental pain and request to see a podiatrist for his diabetes.   Defendant Crocker obtained approval from the United States Marshals Service for Plaintiff to see an off-site dentist; the appointment was scheduled for August 9, 2022.

On August 2, 2022, Detention Center staff notified Defendant Crocker that Plaintiff had refused 17 meal trays over the last few days.    Plaintiff submitted a sick call request that same day, reporting for the first time that he had declined food trays since July 25, 2022, and complaining that no hunger strike protocol had been performed on him.   When Defendant Crocker saw Plaintiff, he complained that his Kosher diet was not being properly prepared.   During this visit, Defendant Crocker explained to Plaintiff that because he was receiving food from the Commissary, it was not necessary to perform a hunger strike protocol.   Defendant Crocker offered

to check Plaintiff's vitals, but Plaintiff declined.   Also on August 2, 2022, Defendant Crocker spoke with Plaintiff's primary care provider and explained that TurnKey staff have no control over kitchen diets for the inmates.   Defendant Crocker spoke with Defendant Case about Plaintiff's complaints about his diet.   Defendant Crocker was not involved in the decision to take Plaintiff off of his Kosher diet.

Plaintiff's August 3, 2022 lab work did not indicate any emergent condition or need that was not already being treated, but were consistent with his diagnosis of uncontrolled diabetes and hypertension.   On August 4, 2022, Plaintiff submitted a sick call request asking for an off-site specialty eye and podiatry appointment, which Defendant Crocker conveyed to Nurse Carter. Plaintiff had his appointment with the podiatrist on October 20, 2022.   Plaintiff ultimately refused his dental appointment because he was mad for being taken to the hole.

After Plaintiff complained of intense stomach pain on August 6, 2022, he was taken to Arkansas Methodist Medical Center; he was seen there for complaints of acute generalized abdominal pain and renal insufficiency.   At the Arkansas Methodist Medical Center, staff performed blood work, a urinalysis, and a CT of Plaintiff's abdomen and pelvis.   The CT did not show any emergent findings.   Plaintiff's blood work showed mild kidney disease, which the provider noted can be caused from uncontrolled blood pressure, blood sugar, or medications. Medical staff determined that Plaintiff was medically screened and fit for incarceration, and directed that he continue all home medications. Plaintiff's mild kidney disease was directly related to his failure to consistently take his prescribed medications and not by the medical care or treatment provided to him by TurnKey staff.

On October 26, 2022, Plaintiff submitted a sick call request complaining of chest pains the night before.   Defendant Crocker saw Plaintiff that same day.   Plaintiff's vitals were stable, and the chest pain he described was consistent with his earlier history of gastroesophageal reflux.

On October 31, 2022, Defendant Crocker requested approval from the United States Marshal Service to send Plaintiff for an off-site optometry appointment in connection with Plaintiff's October 28, 2022 complaint of blurry vision.   The request was denied because Plaintiff had been in the Marshal's custody for less than 130 days and because Plaintiff had an eye exam recently.

On November 3, 2022, TurnKey personnel took labs for Plaintiff, which indicated that Plaintiff's condition was stable but that he remained noncompliant with treatment.   Nurse Carter discussed Plaintiff's labs with Plaintiff.

On November 28, 2022, Plaintiff again requested on off-site eye exam.   Plaintiff's request was communicated to the Marshals Service; the Marshals Service denied the request.   On December 22, 2022, Plaintiff submitted a sick call request demanding an off-site visit to a hospital or nephrologist due to kidney pain and eye pain.   Plaintiff's request was conveyed to the Marshals Service.   Plaintiff refused an on-sight eye examination during a December 22, 2022 visit with a Nurse Honeycutt.   Nurse Honeycutt prescribed Plaintiff antibiotics that day for Plaintiff's complaints of flank pain and leukocytes in his urinalysis.

On December 23, 2022, Defendant Crocker saw Plaintiff for his request for off-site diabetic care, including nephrology and optometry.   Defendant Crocker again requested approval from the Marshals Service for Plaintiff's off-site eye exam.   This time, the request was approved.

On December 24, 2022, Plaintiff refused his antibiotics saying that he could not trust the medications.

On December 29, 2022, Defendant Crocker requested an off-site appointment for Plaintiff at NEA Baptist Nephrology.

Throughout his incarceration, Plaintiff was consistently prescribed and offered medication to treat his chronic conditions, including hypertension and diabetes.   Throughout his incarceration, Plaintiff frequently refused his regularly-scheduled insulin doses.   Each time Plaintiff did so, TurnKey medical staff counseled him of the risks for refusing treatment for his diabetes.

Again, Plaintiff explained that he refused insulin because his blood sugar was not high enough to warrant taking it at each prescribed time.  (Doc. No. 53 at 10-11, for example and among others).   Plaintiff provided no evidence to establish the insulin prescribed demonstrated deliberate indifference to his serious medical needs.   At times during this case Plaintiff has maintained that his diabetes was not out of control.   (Id.).   But Plaintiff acknowledged in his Complaint that when he went to the hospital, he was told he had "mild kidney disease due to out of control blood sugar from diabetes."   (Doc. No. 7-1 at 20).   Plaintiff's failure to comply with medical treatment is significant.   Beck, 253 F.3d at 333-34; Logan v. Clarke, 119 F.3d at 650.

As explained above in connection with the County Defendants' Motion, nothing in the record establishes that a Kosher meal would have remedied Plaintiff's out-of-control diabetes or his hypertension—because a Kosher diet does not necessarily equate to a healthy diet for a diabetic suffering from hypertension.

Further, Plaintiff did not contest the Statement of Undisputed Facts submitted by Defendant Crocker or the medical records submitted by Defendant Crocker.   (Doc. Nos. 91, 93-3, 93-4; Doc. Nos. 98, 106).   The record reflects that Plaintiff's blood sugar and blood pressure was monitored while he was at the Detention Center.   (Doc. No. 93-3 at 7-21).   The record also reflects that

Plaintiff often refused medication.   (Doc. No. 93-3 at 60-74, for example and among others; Doc. No. 93-4 at 13-16, for example and among others).   The record includes when medication was administered and what medication Plaintiff was given.   (Doc. No. 93-4).   While Plaintiff may have preferred different medication or other treatment options, he has no right to his preferred course of treatment—so long as there otherwise is no violation of his rights.   Barr v. Pearson, 909 F.3d 919, 921 (8th Cir. 2018).

All things considered, no reasonable jury could find that Defendant Crocker was deliberately indifferent to Plaintiff's serious medical needs.   As such, summary judgment in Defendant Crocker's favor on Plaintiff's personal capacity claims against her is appropriate.   And because Plaintiff failed to establish individual liability against Defendant Crocker, summary judgment on Plaintiff's official capacity claims against her is appropriate, as well.

## IV.    Other Claims Plaintiff Raised

Plaintiff raised other claims in his Complaint that remain pending, including a retaliation claim and an access to the courts claim.   (Doc. No. 7-1).   Those claims fall under 42 U.S.C. § 1983.   "Liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights."   Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (citing Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).   Bare allegations void of factual enhancement are insufficient to state a claim for relief under § 1983.   See Iqbal, 556 U.S. at 678.

Plaintiff's retaliation claim was not served because he did not identify those who allegedly retaliated against him.   (Doc. No. 6-1).   Without allegations of a Defendant's allegedly unlawful

conduct, Plaintiff cannot establish liability on his retaliation claim.   As such, Plaintiff's allegations of retaliation fail to state a claim on which relief may be granted and are dismissed without prejudice.

Plaintiff also alleged his right to access the courts had been violated.   To the extent Plaintiff claims his right to access the courts was violated, "'to assert a successful claim for denial of meaningful access to the courts . . . an inmate must demonstrate that he suffered prejudice.'" Beaulieu v. Ludeman, 690 F.3d 1017, 1037 (8th Cir. 2012) (internal citation omitted).   Because Plaintiff has not alleged any actual prejudice, Plaintiff's access to the courts claim also fails and is dismissed without prejudice.

## V.    CONCLUSION

IT IS THEREFORE ORDERED that:

1.    The Clerk of the Court is directed to change Defendant Bailey Burns's name on the docket to Bailey Crocker.   (Doc. No. 94).

2.    To the extent Doe Defendant Jaimie is not Defendant Jamie Floyd, Plaintiff's claims against the Doe Defendant are DISMISSED without prejudice for lack of service.

3.    Plaintiff's retaliation and access to the courts claims are DISMISSED without prejudice for failure to state a claim on which relief may be granted.

4.    Plaintiff's claims for injunctive relief are DISMISSED without prejudice for lack of jurisdiction.

5.    The County Defendants' Motion for Summary Judgment (Doc. No. 89) is DENIED as moot as to Plaintiff's retaliation claims, access to the courts claims, and claims for injunctive relief.

6.    The County Defendants' Motion for Summary Judgment (Doc. No. 89) is GRANTED as to Plaintiff's First Amendment, RLUIPA, and Fourteenth Amendment claims.

7.    Defendant Crocker's Motion for Summary Judgment (Doc. No. 93) is DENIED as to Plaintiff's claims for injunctive relief because those claims are moot.

8.    Defendant Crocker's Motion for Summary Judgment (Doc. No. 93) is GRANTED as to Plaintiff's Fourteenth Amendment claims.

9.    The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an in forma pauperis appeal from this Order and the accompanying Judgment would not be taken in good faith.

DATED this 13th day of July, 2023.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRSTE JUDGE